J-S59045-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: R.H., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.L.H., JR., FATHER | No. 3481 EDA 2015 |

Appeal from the Decree dated October 13, 2015,
in the Court of Common Pleas of Philadelphia County, Family Court,
at No(s):　CP-51-AP-0000644-2015
CP-51-DP-0000831-2010
FID#51-FN-002045-2010

| | |
|---|---|
| IN THE INTEREST OF: R.H., A/K/A R.J.L.H., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.L.H., JR., FATHER | No. 3482 EDA 2015 |

Appeal from the Decree dated October 13, 2015,
in the Court of Common Pleas of Philadelphia County, Family Court,
at No(s): CP-51-AP-0000645-2015
CP-51-DP-0000832-2010
FID#51-FN-002045-2010

| | |
|---|---|
| IN THE INTEREST OF: R.H., A/K/A R.A.J.H., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.L.H., JR., FATHER | No. 3483 EDA 2015 |

Appeal from the Decree dated October 13, 2015,
in the Court of Common Pleas of Philadelphia County, Family Court,
at No(s): CP-51-AP-0000646-2015
CP-51-DP-0000833-2010
FID#51-FN-002045-2010

BEFORE: BENDER, P.J.E., OLSON, J., and FITZGERALD,[*] J.

---

[*] Former Justice specially assigned to the Superior Court.

J-S59045-16

MEMORANDUM BY FITZGERALD, J.:                    **FILED SEPTEMBER 07, 2016**

R.L.H., Jr. ("Father"), appeals from the decrees and orders dated and entered on October 13, 2015, granting the petitions filed by the Philadelphia County Department of Human Services ("DHS" or "Agency"), seeking to involuntarily terminate Father's parental rights to his dependent, minor (1) twin children, R.L.H. and R.J.L.H., born in November of 2004, and (2) R.A.J.H., born in November of 2005 ("Children"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), and to change the Children's permanency goal to adoption under the Juvenile Act, 42 Pa.C.S. § 6351.[1]  We affirm.

The trial court set forth the factual background and procedural history of Father's appeal as follows:

> Father currently lives with two adults, Mother and Ms. L.B. ("Father's paramour").  In addition to R.L.H., R.J.L.H. and R.A.J.H. ("the Children"), Father has two children with Father's paramour.  The three adults are choosing to raise their children together.
>
> The case was started on December 22, 2004, when the Department of Human Services ("DHS") received a Child Protective Services ("CPS") report stating that the Children were failing to thrive.  The report was indicated and the Services to Children in their Home ("SCOH") were implemented.

---

[1] In separate decrees dated and entered on October 13, 2015, the trial court terminated the parental rights of J.H. ("Mother"), the mother of Children. Mother has filed an appeals from the termination of her parental rights, at Docket Nos. 3414, 3415, and 3416 EDA 2015, which we do not address in the present appeal.

On or about March 14, 2008, DHS received a General Protective Service ("GPS") report alleging that the [C]hildren had poor hygiene. The parents were contacted about the Children's poor hygiene, and their hygiene improved for a brief period of time. According to the report, the Children's hygiene became progressively worse. The Children wore soiled clothes and smelled of urine. The school bathed the Children and washed their clothes, but they continued to return to school dirty and smelling of urine. This report was substantiated.

On or about September 30, 2010, DHS received another GPS report indicating that the Children were not potty trained, and while at a doctor's appointment, the Children and Mother were "dirty and malodorous." The Report further indicated that the Children appeared developmentally delayed. During the appointment, Mother appeared to be overwhelmed caring for the Children. This report was substantiated.

On October 22, 2010, DHS obtained an Order of Protective Custody ("OPC") and placed the Children in the care of their paternal great aunt, [T.B.] The Children are currently still in [T.B.'s] care.[1] Prior to the Children's placement with [T.B.], "there were three adults and four children living in an efficiency apartment. There was one full size mattress and a deflated twin mattress on the floor. There were roaches, wire under the floor, an extension cord running outside to a deep freezer, the children were in diapers, and the children were not in school[2]."

On November 18, 2010, the Children were adjudicated dependent based on present inability. The parent's [sic] Family Service Plan ("FSP") objectives were: 1) weekly visits with [sic] [parents] weekend [sic]; 2) Parenting capacity evaluation; 3) Bonding evaluation; 4) Individual and family therapy; 5) Family school; and 6) Housing. N.T. 10/13/15 at 74-75.

In 2011, all three adults were given an ATA evaluation, which stated that as a unit of three, there is parental capacity.

Due to the special nature of the three parents, Mother and Father were given numerous opportunities to visit with the Children so that they would gradually adjust to taking care of three special needs children. On November 4, 2010, the parents' visits changed to liberal supervised visits, to be supervised by the paternal great aunt. On June 30, 2011, the parents' visits were changed to supervised visits at the [A]gency. On May 14, 2012, the parents' visits were increased to one supervised visit at the [A]gency and supervised visits at the home of Father's paramour's mother, supervised by DHS. On October 10, 2013, the Children started to have unsupervised visits with their parents at the paternal great aunt's home for five hours on Saturdays.

The unsupervised visits were expanded to overnight visits (Tuesday through Thursday) on January 2, 2014. The [A]gency was assigned to conduct spot checks three times a week during the overnight visits with the Children. The unsupervised overnight visits were temporarily suspended after a CPS report was filed alleging physical abuse. The report alleged that Mother had beaten the Children with a belt that left bruises on the Children's arms. The Children were subsequently seen at the Emergency Department of Children's Hospital of Philadelphia ("CHOP"). The examining physician, Dr. Cynthia Mollen, testified that the Children's bruising were [sic] consistent with being hit with a belt. Dr. Mollen stated that the Children were in severe pain as a result of the beating. After this report was substantiated, the parents were allowed continued visits with pop-up visits by the foster care [A]gency.

On or about December 16, 2014, Ms. Burton (Community Umbrella Association ("CUA") - Wordsworth case manager) was informed that the parents[3] had moved from Philadelphia and relocated to the Poconos. The [c]ourt was informed on January 29, 2015 of the parents' move. At this hearing, the visits were changed to supervised visits. Father initiated contact with the Children via text message on February 7, 2015. After the move, the parent's [sic] first visit with the Children was in May, 2015. In the interim, the Children did not visit with their parents from December 9, 2014 until the beginning of

- 4 -

May, 2015. Any subsequent visits involved DHS transporting the Children to the Poconos; the parents did not visit the Children in Philadelphia since their move in December, 2014.

The Petition[s] for Involuntary Termination [were] filed September 21, 2015. [On that same date, DHS filed the petitions for a permanency goal change to adoption.]

_____

[1] Since the OPC was obtained, the Children have resided with their paternal great aunt for the duration of this case for a total of five years. When this case started, R.L.H. and R.J.L.H. were six years old and R.A.J.H. was 5. At the time of the termination hearing, the Children were eleven and ten years old respectively.

[2] Based on the Assessment & Treatment Alternatives, Inc. ("ATA") evaluation by Dr. Williams on August 19, 2011. This document was admitted into evidence at the termination hearing. N.T. 10/13/15 at 216 (See attached Exhibit A for the 2011 parenting capacity evaluations for all three adults living in the home). At this time, the parents were allowed supervised visits with the Children.

[3] Prior to the parent's [sic] move, they were last seen in court at the October 30, 2014 permanency hearing, which was continued.

Trial Ct. Op. (Father), 3/4/16, at 1-4.

The trial court made the following findings from the testimony and evidence admitted at the hearing.

. . . The Termination hearing was held on October 13, 2015. During the hearing, the Court heard from seven witnesses: Dr. Erica Williams (ATA Forensic Psychologist), Denise Burton (CUA Wordsworth case worker), Brenda [sic] Bradley (mental health worker through Northeast Treatment Center ["NET"]), Leslie Toomer (supervisor of the assigned Child Advocate social worker), Samantha Salvatico-Parent (CUA Wordsworth case manager), Butler

[sic] [Donia] Todd [the DHS social worker assigned to the family], Mother and R.H. ("Father").

Dr. Williams testified for the parents, regarding the parents' initial bonding evaluation as well as the parenting capacity evaluation in 2011. N.T. 10/13/15 at 18. Dr. Williams testified that: "If they were to work as a unit," they would have the capacity to parent the Children. *Id.* at 21.

However, when the parents were re-referred to Dr. Williams for an updated parenting capacity evaluation in 2013, Dr. Williams found that:

It was found in 2013 to be very clear that separate of each other, there was no individual capacity to provide for each of the five children. The main concerns revolved around [the] originating concerns which were hygiene meaning the [C]hildren's day-to-day needs, housing . . . in each evaluation it was determined that they were provided those services, but for a variety of reasons would stop taking the steps . . . the parents were responsive to the intervention[,] they were open to the feedback[,] but the same issues kept returning, and this was with an increase in supervision not yet unsupervised contacts for long periods of time . . . there seems to be a rinse (sic) and repeat of going so far stepping back, going so far stepping back.

*Id.* at 21-23. Dr. Williams also indicated that the parent's [sic] lack of capacity to parent was not based on their developmental disabilities. *Id.* at 35. In particular, Dr. Williams indicated that:

Very often, people with developmental disabilities can thrive as parents particularly given the right supports. In this case the recommendations have been made for years that they get certain supports. And the concern here is despite the provision of those supports, despite all the efforts that they're making multiple choices to do different things that place the children at harm that cause them to leave the children's lives, and that's not something that

necessarily can be explained by developmental disability rather than a choice in behavior.

*Id.* at 35-36.

In addition to Dr. Williams's testimony about the parent's [sic] lack of capacity, she testified that in the long term, the parents' inconsistent involvement in the Children's lives would be detrimental. *Id.* at 38. Their inconsistent involvement could create initial excitement, but creates an underlying lack of security, lack of attachment, and kind of an inability to know if your needs are going to be met . . . [in the] long term, that's very detrimental." *Id.* Dr. Williams also commented on the Children's bond with the parents from her bonding evaluation on June 11, 2013. *Id.* at 42-44. In her evaluation, the [d]octor noted that there would "be a negative impact on the [C]hildren if their relationship were to cease[.] . . ." *Id.* at 44. In this case, the immediate concern was that "the [parents] disappeared. That they did not announce their departure, they did not have contact with any of the case workers, they simply disappeared, moved with nothing." *Id.* at 51. In this case, even though Dr. Williams testified to the existence of a bond, she also commented that "the family chose to sever that contact [with the Children] unannounced, and those concerns remain even if they found fantastic housing and funding for infinity and beyond, the behaviors are concerning." *Id.* at 54.

At the conclusion of her testimony, Dr. Williams indicated that the parents do not have the capacity to parent either individually or collectively. *Id.* at 63. Dr. Williams further indicated that there would be no irreparable harm if the parental rights were severed. *Id.* at 69.

Ms. Burton testified that after the parents moved, they had a few telephone conversations with the Children, but still had not visited on April 29, 2015. *Id.* at 89-91. The visits did not resume until May or June of 2015. *Id.* at 102-03.

- 7 -

Ms. [sic] Bradley testified that R.A.J.H. "was feeling angry and sad and didn't understand why his parents left him." *Id.* at 144.

Ms. Toomer testified that the parents had moved five times since 2010. *Id.* at 182.

Ms. Todd testified that she has been involved in the case since 2010. *Id.* at 231. However, Ms. Todd did not observe many of the supervised visits; they were supervised mainly by an [A]gency worker. Ms. Todd did testify that during the few visits she supervised, the bonding was extremely strong with the family. *Id.* at 271, 275-76. There were a couple of incidents where the Children would return from visits and were not properly dressed. *Id.* at 252. Ms. Todd also testified that the parents made no effort to visit the Children after the move; one of the caseworkers brought the Children to the visits in the Poconos. *Id.* at 277-78. Ms. Todd was not informed of the family's move to the Poconos until March, 2015. *Id.* at 282, 292. The social worker also presented testimony that the parents' FSP objectives were: 1) parenting; 2) visits; 3) housing; 4) special child care or educational program; 5) therapeutic services for the Children; and 6) mental health for both parents. *Id.* at 233-34.

Ms. Salvatico-Parent testified that the Children are bonded with [T.B.], their kinship caregiver, in a parent-children relationship. *Id.* at 203. She also testified that neither parent has reached out to inquire about the [C]hildren since Ms. Salvatico-Parent had been assigned to the case[4]. *Id.* at 205.

Next, Father was called to testify. Father testified that the family's income is about $4,912 a month, including his income of $3,446[5]. *Id*[*.*] at 325-26. Father also testified to having financial troubles prior to their move to the Poconos in December of 2014. *Id*[*.*] at 329. During this time, Father acknowledged that he could not keep his phone on to communicate with people, but was able to use relatives' phones. *Id*[*.*] at 329-30. When . . . Father moved to the Poconos with Mother and his paramour, his sister helped him buy a house. *Id*[*.*] at 334. Father also

testified that he only attended "three or four" of the parenting classes with Mother, while the paramour attended the remainder of the classes alone. *Id*[*.*] at 340-41.

After closing arguments, the [c]ourt made the following findings as to the credibility of the witnesses: 1) Dr. Williams was credible and her testimony accepted in full; 2) Ms. Burton was credible and her testimony was accepted in full; 3) Ms. Toomer was credible and her testimony was accepted in full; 4) Ms. Todd's testimony was partially credible and her testimony accepted in part. "Specifically, the [c]ourt does not find the testimony concerning bonding to be credible, and does not accept that testimony at all"; 5) Mother's testimony was credible and her testimony was accepted in full; 6) Father's testimony was partially credible and accepted in part; 7) Mr. Bradley's testimony was partially credible and accepted in part. The [c]ourt does not find credible[4] the testimony concerning the bond and the irreparable harm; 8) Ms. Salvatico-Parent's testimony was credible and accepted in full. *Id.* at 369-70.

_____

[4] This case worker has been on the case since September 1, 2015. *Id.* at 199.

[5] Father stated that he makes "$723 every two weeks, from [his father's company] and from [a remodeling company] roughly $2 grand a month." *Id*[*.*] at 325. The other sources of income are $1,466 with the Mother's Social Security Income ("SSI") and the [f]ather's paramours' SSI check[s], for $733 each person. *Id*[*.*] at 326.

*Id.* at 4-7.

Additionally, the trial court set forth the following to explain its decision.

[On] March 10th, 2011, Judge Butchart ordered a parent capacity evaluation. That parent capacity evaluation was done by Dr. Williams and yielded

- 9 -

certain interesting but important factors, neither of the parents individually were capable of being parents. It is uncontroverted[,] not refuted in any way nor today have the parents presented any evidence to challenge Dr. Williams['] testimony[,] that individually they could not parent . . . uniquely Dr. Williams found that . . . as a corporate [sic] units, given the proper structure, these parents as a unit possibly could parent . . . the court had expected there would be some expert testimony to challenge Dr. Williams but there was none. And when there is no expert testimony to challenge the expert who testifies, no lay evidence can. So that evidence goes un-refuted. Not only did it go un-refuted, unchallenged by any party here even in closing, not even in closing do the attorneys for the parents challenge the testimony of Dr. Williams . . . or cross examine her is [sic] such a way that would even give this [c]ourt the remote possibility that she was wrong in her decision.

*Id*[*.*] at 371-73.

The [c]ourt further noted that despite the "large income he [Father] now says he has, despite that large income [,] he did not make any effort to take a bus, plane, train, to see his kids, or to contact his children by phone." *Id* at 376. In regard to a bond between the parents and the Children[,] the [c]ourt stated that:

while it is true that there's been testimony that this is a bond clearly of some level, the [c]ourt does not find [it] to be a parental bond. The testimony has been that the Children enjoy being with their parents. . . the [c]ourt does not really find from the basis of the testimony that there is a parental bond, it is a friendly bond . . . it is not a parental bond, and while there is a negative impact according to Dr. Williams . . . it was not irreparable harm if termination was to take place.

*Id*[*.*] at 377 -78.

It should be noted that DHS was limited in the testimony of Ms. Todd as a result of a violation of the discovery rules prior to the termination hearing. In particular, DHS agreed that it failed to comply with the [c]ourt's order[6]. N.T. 10/13/15 at 216-17. As a result of DHS failing to provide the necessary documents, Ms. Todd was precluded from testifying to the "visitation or FSP's of [sic] the parent's [sic] compliance with mental health, progress notes. . ." *Id.* at 6-8, 218-19. Further, it is noted that Mother's attorney also failed to produce the required discovery requirements and was limited in the type of questions that could be presented to Ms. Todd. *Id.* at 9 -10.

The [c]ourt specifically commented on the lack of compliance of both DHS and Mother's attorney. The [c]ourt stated that:

[M]y problem is this, when I give an order, and I make it clear, what am I supposed to do as a judge when you guys defy that order especially with regard to [the] exchanging of important evidence prior, prior to trial, Mr. Alston. That's the whole purpose of setting up orders; isn't that correct, sir? And you suffer the consequences when you don't follow by that, you can't come to the court and then say "it unduly prejudiced, judge" because I fail to follow your order concerning giving up information. . . its [sic] unduly prejudiced to come in to say, judge, now we're unduly prejudiced because we can't put this evidence [on].

*Id.* at 9-10.

During the termination hearing, Father objected to the admittance of Dr. Williams' ATA evaluation, but did not object to the qualifications of Dr. Williams as an expert witness. *Id.* at 17-18, 20.

_____

[6] See Exhibit B (The Court's Order from 6/15/15 requiring all parties to turn in discovery ten days prior to trial)[.]

*Id.* at 8-9.

On October 13, 2015, the trial court entered the decrees and orders involuntarily terminating Father's parental rights to the Children pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), and changing the Children's permanency goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S. § 6351.[2]

In his brief, Father raises the following issues:

> 1. Did the Court below erroneously find that [Father] had abandoned the [C]hildren?
>
> 2. Did the Court below erroneously find that there were dependency issues which had not been resolved or which could not be resolved within a reasonable period of time?
>
> 3. Did the Court below erroneously find that witnesses who opposed the goal of adoption were only partially credible?
>
> 4. Did the Court erroneously find that adoption was in the [C]hildren's best interests?
>
> 5. Did the Court erroneously find that there was a lack of services available to meet the [C]hildren's special needs in the county where [Father] resided in/had moved to?

Father's Brief at 4.[3]

_____

[2] This Court, acting *sua sponte*, consolidated the appeals on December 15, 2015.

[3] In its Pa.R.A.P. 1925(a) opinion, the trial court suggests that we should find that Father waived his issues for vagueness and lack of specificity. We decline to find the issues waived for that reason. **See Commonwealth v. LaBoy**, 936 A.2d 1058, 1060 (Pa. 2007) (*per curiam*). We find, however, that Father waived any challenge to the change of permanency goal to adoption by his failure to raise the issue in his concise statement and in the statement of questions involved portion of his brief. **See Krebs v. United Refining Co. of Pa.**, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an

In his first, second, and fifth issues, which we will consider together, Father challenges the termination of his parental rights under Section 2511(a). In his first issue, Father asserts that the trial court erroneously found that he abandoned the Children. In his second issue, Father argues that prior to the termination proceedings, he and Mother had resolved all dependency issues, and that the reunification of the parents and the Children was imminent. Father claims that he was being evicted and that he would have become homeless had he not moved from Philadelphia. He contends that the trial court penalized him for deciding to move out of Philadelphia for better housing, more stable employment, and an improved environment. *Id.* at 7. Father asserts that at worst, he displayed less than ideal judgment in not informing his DHS social worker immediately with regard to his plans. Father claims that due to economic factors, he was not initially able to travel back and forth from the Poconos to visit the Children, but he attempted to maintain telephone contact with them by calling the

_____

appellant waives issues that are not raised in both his or her concise statement of errors complained of on appeal and the statement of questions involved portion of in his or her brief on appeal); *accord* Pa.R.A.P. 1925(b)(4)(vii) (stating, "Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."). Moreover, as Father failed to develop any challenge to the change of permanency goal in the argument portion of his brief, he waived the challenge. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (stating, "[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." (citation omitted)).

foster mother's home. *Id.* In his fifth issue, Father asserts that all of the services that the parents needed were located in their new town. Father claims that the parents engaged in the services in which they had previously engaged in Philadelphia. Father asserts that the case should have been transferred to his new county's DHS-equivalent agency, which was aware of Father and was willing to provide assessment and services as needed. *Id.* at 7-8.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [W]e repeat that appellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As we discussed in [*In re R.J.T.*, 9 A.3d 1179 (Pa. 2010)], there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an

appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (citations omitted).

The burden is upon the petitioner "to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained that

> [t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (citation omitted). This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

The instant trial court terminated Father's parental rights under Sections 2511(a)(1), (2), (5), (8), and (b). Sections 2511(a)(1), (2), and (b), provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1)-(2), (b).

We have explained this Court's review of a challenge to the sufficiency of the evidence supporting the involuntary termination of a parent's rights pursuant to Section 2511(a)(1) as follows:

To satisfy the requirements of section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties.

\* \* \*

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citations omitted).

> [t]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

*In re Z.P.*, 994 A.2d 1108, 1119 (Pa. Super. 2010) (alterations in original and citation omitted); *see also In re C.L.G.*, 956 A.2d 999, 1006 (Pa. Super. 2008) (*en banc*).

Further, regarding the definition of "parental duties," this Court has stated as follows:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

- 17 -

> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life'.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted).

Next, to satisfy the requirements of Section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *See In re M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). The grounds for termination of parental rights under Section 2511(a)(2) "are not limited to affirmative misconduct. To the contrary, those grounds may include acts of

refusal as well as incapacity to perform parental duties." ***In re A.L.D.***, 797 A.2d 326, 337 (Pa. Super. 2002) (citation omitted).

With regard to Section 2511(a)(1) and (2), the trial court found as follows:

> Father's ATA evaluation and the testimony of Dr. Williams showed that Father alone did not have the capacity to parent the Children. There was no other expert testimony presented to dispute Father's parental capacity.
>
> Since the Children's adjudication, there has been no consistent change in the circumstances that brought the [C]hildren into DHS care. Specifically, Dr. Williams states that:
>
> > . . . for a variety of reasons [they] would stop taking the steps . . . the parents were responsive to the intervention[,] they were open to the feedback [,] but the same issues kept returning, and this was with an increase in supervision not yet unsupervised contacts for long periods of time . . . there seems to be a rinse (sic) and repeat of going so far stepping back, going so far stepping back[.]
>
> N.T. 10/10/15 at 21-23.
>
> In addition to Dr. Williams' testimony about the parent's lack of capacity, she testified that in the long term, the parents' inconsistent involvement in the Children's lives would be detrimental. Their inconsistent involvement could create initial excitement, but creates an underlying lack of security, lack of attachment, and kind of an inability to know if your needs are going to be met. . . [in the] long term, that's very detrimental." ***Id.*** Father's appeal fails to state that they relocated to the Poconos without informing anyone and neither communicated nor contacted the Children until March, 2015.
>
> Father argues that they had services available in the County where they moved to. However, they did not give

the [c]ourt or the Children's caseworker the time nor [sic] the opportunity to properly transfer the jurisdiction.

Dr. Williams indicated that Father's lack of capacity to parent as a unit was not based on any developmental disability. In particular, Dr. Williams stated that:

Very often, people with developmental disabilities can thrive as parents particularly given the right supports. In this case the recommendations have been made for years that they get certain supports. And the concern here is despite the provision of those supports, despite all the efforts that they're making multiple choices to do different things that place the children at harm that cause them to leave the children's lives, and that's not something that necessarily can be explained by developmental disability rather than a choice in behavior.

*Id.* at 35-36.[4]

Here, we have a case of a Father who "simply disappeared, moved with nothing." *Id.* at 51. There was no other credible testimony presented to show that Father had resolved any of the issues that brought the [C]hildren into care. Not only did Father disappear, but he testified to making a monthly income of $3,446 and not being able to visit his children or maintain telephone contact with them after they "relocated" to the Poconos in Decembers. All visits after the parents' move were initiated by the case worker who took the Children to the Poconos to visit with their parents.

In the instant case, the [c]ourt was satisfied that grounds for termination under 2511(a)(1) [and] (2). . . . were satisfied.

Trial Ct. Op. at 12-13 (some citations omitted).

---

[4] We acknowledge the trial court quoted this same passage on page five of its opinion. *See* Trial Ct. Op. at 5.

After a careful review of the record in this matter, we find the trial court's factual findings are supported by the record, and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *See In re S.P.*, 47 A.3d at 826-27. We therefore affirm the termination of Father's parental rights with regard to Section 2511(a)(1) and (2). Moreover, we view Father's argument concerning DHS's failure to forward the matter to the agency in his new town an argument that DHS failed to make reasonable efforts to avoid termination. We find that this contention lacks merit. Our Supreme Court, however, has held that the trial court is not required to consider an agency's reasonable efforts in relation to a decision to terminate parental rights. *In re D.C.D.*, 105 A.3d 662, 675 (Pa. 2014). Thus, Father's fifth issue lacks merit. *See id.*

Next, we review Father's fourth issue, in which he argues that the trial court had already reunified two of his other children. Father alleges that by the time he relocated, the Children shared a strong bond with him, which was never severed. Father contends that the testimony revealed that because of that bond, the Children would be harmed by the termination. Father thus concludes argues that the trial court should not have terminated his parental rights. Father's Brief at 7-8.

This Court has stated that "the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b)

is on the child." ***In re C.L.G.***, 956 A.2d at 1008 (citation omitted). Our

Supreme Court held

> if the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." ***In re K.M.***, 53 A.3d 781, 791 (Pa. Super. 2012). In ***In re E.M.***, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).

The instant trial court provided the following analysis of Section

2511(b):

> In the instant case, the Court was satisfied that grounds for termination under § 2511 (b) of the Adoption Act were established by clear and convincing evidence. One of the core sources for the strength of a parental bond are the visits between Father and the Children. The main purpose for offering parents visitation with their children is to "preserve the unity of the family whenever possible or to provide another alternative permanent family when the unity of the family cannot be maintained." 42 Pa.C.S.A. § 6301.
>
> In this case, even though Dr. Williams testified to the existence of a bond, she also commented that "the family chose to sever that contact [with the Children] unannounced, and those concerns remain even if they found fantastic housing and funding for infinity and beyond, the behaviors are concerning." ***Id.*** at 54. Dr. Williams also testified that the severance of the relationship was a choice and not a product of either parent's disability.

- 22 -

In addition to Dr. Williams' testimony about the parents' lack of capacity, she testified that in the long term, the parents' inconsistent involvement in the Children's lives would be detrimental. Their inconsistent involvement could create initial excitement, but creates an underlying lack of security, lack of attachment, and kind of an inability to know if your needs are going to be met. . . [in the] long term, that's very detrimental." ***Id.*** Dr. Williams also commented on the Children's bond with the parents from her bonding evaluation on June 11, 2013. In her evaluation, the Doctor noted that there would "be a negative impact on the [C]hildren if their relationship were to cease . . ." ***Id.*** at 44. In this case, the immediate concern was that "the [parents] disappeared. That they did not announce their departure, they did not have contact with any of the case workers, they simply disappeared, moved with nothing." ***Id.*** at 51.

For these reasons, the [c]ourt properly terminated Father's parental rights based on 2511(b). Based on the foregoing, this Court properly found that termination of Father's parental rights would best serve the needs and welfare of the Children.

Trial Ct. Op. at 15-16 (some citations omitted).

After a careful review of the record in this matter, we find the trial court's factual findings are supported by the record, and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***See In re S.P.***, 47 A.3d at 826-27. We therefore affirm the termination of Father's parental rights with regard to Section 2511(b). ***See id.***

Finally, in his third issue, Father contends that there was no basis for the trial court to find the DHS social worker, Ms. Todd, who had worked with the family the longest, was only partially credible. Father asserts that particularly as to bonding, Ms. Todd was the person who had ongoing

contact with the parents and the Children for almost five years and had ongoing opportunities to observe them together. Father alleges that the finding that Ms. Todd lacked credibility was a "red herring to orchestrate a termination based on the child advocate's witness." Father's Brief at 8.

The trial court found the following with regard to Father's third issue:

> Father contends that the [c]ourt erred in finding the "witnesses who opposed the goal of adoption" to be partially credible. Although this statement of error is vague and does not specify any specific witnesses; after a review of the record, the [c]ourt found Ms. Todd and Father to be partially credible. N.T. 10/13/15 at 369-70.
>
> In this case, the [c]ourt was the finder of fact, and in this capacity, the [c]ourt is able to make decisions regarding the credibility of the witnesses. *In re K.K.R.-S.*, 958 A.2d 529, 532 (citing to *In Re K.J.*, 936 A.2d 128,131-32). As the finder of fact, the [c]ourt can accept testimony in part, in full or not find the testimony credible. The appellate court "must accord the hearing judge's decision the same deference it would give to a jury verdict." *Id.* For these reasons, the [c]ourt did not err in its credibility determination for "the witnesses who opposed the goal of adoption."

Trial Ct. Op. at 14. We agree with the trial court's reasoning. *See In re S.P.*, 47 A.3d at 826-27; *accord In re C.M.C.*, ___ A.3d ___, 2016 WL 3036811 at *4 (Pa. Super. May 26, 2016) (holding, "an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations"). Accordingly, we find that Father's third issue lacks merit.

After a careful review of the record in this matter, we find the trial court's factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

***See In re S.P.***, 47 A.3d at 826-27.  We therefore affirm the termination of Father's parental rights with regard to the Children under Section 2511(a)(1), (2), and (b), and the change of the Children's permanency goal to adoption.

Decrees and orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/7/2016